## WILLIAMS *v.* UNITED STATES.

## WILLIAMS *v.* UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE
NORTHERN DISTRICT OF CALIFORNIA.

Nos. 266, 267.   Argued October 27, 1897. — Decided November 29, 1897.

The illegal acts described in subdivisions 1 and 2 of Rev. Stat. § 3169, for
the alleged violation of which the plaintiff in error was prosecuted,
refer to offences committed by officers or agents acting under authority
of revenue laws.

The Chinese Exclusion Acts have no reference to the subject of revenue,
but are designed to exclude persons of a particular race from the United
States, and an officer employed in their execution has no connection
with the Government revenue system.

When an indictment properly charges an offence under laws of the United
States, that is sufficient to sustain it, although the prosecuting repre-
sentative of the United States may have supposed that the offence
charged was covered by a different statute.

The transactions referred to in the two indictments were of the same class
of crimes or offences, and there was no error in consolidating them at
the trial.

The affidavit and the bank book referred to in the opinion of the court, were
not admissible in evidence against the accused, as, on the face of the
transactions, there was no necessary connection between them and the
charges against him.

The estimate placed upon the character of a government employé by the
community cannot be shown by proof only of the estimate in which he
is held by his coemployés.

It was highly improper for the prosecuting officer to say in open court in
the presence of the jury, under circumstances described in the opinion
of the court, that while Mr. Williams was investigating the Chinese
female cases, there were more females sent back to China than were
ever sent back, before or after.

THE case is stated in the opinion.

*Mr. George D. Collins* for plaintiff in error.

*Mr. Assistant Attorney General Boyd* for defendants in
error.

MR. JUSTICE HARLAN delivered the opinion of the court.

By an indictment returned in the District Court of the United States for the Northern District of California, it was charged that the plaintiff, an officer of the Department of the Treasury, duly appointed and acting under the authority of the laws of the United States, and designated as Chinese inspector at the port of San Francisco, and by virtue of his office being authorized, directed and required to aid and assist the collector of customs of that port in the enforcement of the various laws and regulations relating to the coming of Chinese persons and persons of Chinese descent from foreign ports to the United States, "did then and there, as such officer, wilfully, knowingly, corruptly and feloniously, for the sake of gain and contrary to the duty of his said office and by color thereof, ask, demand, receive, extort and take of one Wong Sam, a Chinese person, a certain sum of money, to wit, one hundred dollars, which said sum of money was not due to him, the said Richard S. Williams," and which he was not, "by virtue of his said office, entitled to ask, demand, receive or take "—that is to say, that "on the thirty-first day of August, in the year of our Lord one thousand eight hundred and ninety-five, there arrived at the port of San Francisco aforesaid from a foreign port or place, to wit, the port of Hong Kong, in the Empire of China, a male person of Chinese descent, to wit, one Wong Lin Choy, who claimed to the collector of customs that he was entitled to land, be and remain within the United States, on the ground that he was a native born of said United States; that thereafter such proceedings were had and taken before said collector of customs in accordance with law that the said Wong Lin Choy was by said collector of customs adjudged to be entitled to and permitted to land at said port as a native born of said United States of Chinese descent, and to be and remain in the said United States; that thereafter . . . on the eighteenth day of September, 1895, . . . the said Richard S. Williams corruptly and extorsively, for the sake of gain and contrary to the duty of his said office and under color thereof, :

did extort, receive and take of said Wong Sam, who was then and there interested in the application or claim of said Wong Lin Choy as aforesaid, a sum of money, to wit, the sum of one hundred dollars as aforesaid, the said Richard S. Williams, under color of his said office, having previously, to wit, on the thirty-first day of August, 1895, at said city and county, State and district aforesaid, feloniously and corruptly obtained and exacted a promise from said Wong Sam for the payment thereof by him, to him the said Richard S. Williams, by then and there falsely and corruptly representing to the said Wong Sam that without the payment thereof to him, the said Richard S. Williams, the said Wong Lin Choy would not be permitted to land at said port, be or remain within the United States, but would be returned to said foreign port from whence he came, against the peace and dignity of the United States of America," etc.

A second count — describing the official character and duties of Williams as in the first count — charged that he wilfully and corruptly, and under color of his office did "take and receive of one Wong Sam, who was then and there interested in the claim of one Wong Lin Choy to be permitted to land at the port of San Francisco aforesaid, a sum of money, to wit, one hundred dollars, as and for a fee, compensation and reward to him, the said Richard S. Williams, for the services of him, the said Richard S. Williams, under color of his said office, in the matter of the application of said Wong Lin Choy, who then and there claimed to the collector of customs of said port to be entitled to land at said port of San Francisco from a foreign port, to wit, the port of Hong Kong, in the Empire of China, and to be and remain in the United States under the claim that he was a native, born in the said United States, which said application was then and there pending and under investigation before said collector of customs as aforesaid, whereas in truth and in fact no fee, compensation or reward was then or at any other time due or owing from the said Wong Sam or any other person to the said Richard S. Williams for such service or any services of him, the said Richard S. Williams, in connection with said matter or at all, nor was he, the said

Richard S. Williams, entitled to the same by law, against the peace and dignity of the United States of America," etc.

A second indictment containing two counts was returned in the same court against the plaintiff in error, describing his official character and duties, and charging him in one count with having wilfully, knowingly, corruptly and feloniously, and in the second, with having wilfully and corruptly, under color of his office, taken from one Chan Ying, a Chinese person, the sum of eighty-five dollars, in consideration of his being permitted to come into and remain within the United States.

The record states that on the margin of each indictment was an indorsement in these words: "Sec. 3169, Rev. Stat. sub. 1 & 2, and sec. 23, act of Feb'y 8, 1875, vol. 1, 2d ed. Supp. Rev. Stat." This indorsement, it is contended, indicates the statutes under which the prosecutions were intended to be instituted.

A demurrer to each indictment having been overruled, the accused was duly arraigned in each case, and pleaded not guilty. The two cases were then, on motion of the Government, consolidated and tried together. The result was a verdict of guilty in each case. Judgment on the verdicts having been asked, the accused interposed a motion in arrest of judgment on the second count of each indictment, and also a motion for a new trial in each case. The first motion was sustained, and the second one having been overruled, the defendant was sentenced in each case to pay a fine of $5000, to be imprisoned for three years to date from September 22, 1896, and to be further imprisoned until the fine imposed on him was paid or until he should be otherwise discharged by due process of law.

The first question to be examined is whether these prosecutions are authorized by any existing statute of the United States. It was assumed by the learned judge who presided at the trial that the indictments were founded upon section 3169 of the Revised Statutes and section 23 of the act of February 8, 1875, c. 36, entitled "An act to amend existing customs and internal revenue laws, and for other purposes." 18 Stat. 307, 312.

Section 3169 of the Revised Statutes is part of Chapter I of Title XXXV, " Internal Revenue," and was brought forward from the act of July 20, 1868, c. 186, § 98, entitled " An act imposing taxes on distilled spirits and tobacco, and for other purposes." 15 Stat. 125, 165. By that section, which is given in full in the margin,[1] it is declared that "every officer

---

[1] § 3169. Every officer or agent appointed and acting under the authority of any revenue law of the United States —

First. Who is guilty of any extortion or wilful oppression under color of law; or

Second. Who knowingly demands other or greater sums than are authorized by law, or receives any fee, compensation or reward, except as by law prescribed, for the performance of any duty; or

Third. Who wilfully neglects to perform any of the duties enjoined on him by law; or

Fourth. Who conspires or colludes with any other person to defraud the United States; or

Fifth. Who makes opportunity for any person to defraud the United States; or

Sixth. Who does or omits to do any act with intent to enable any other person to defraud the United States; or

Seventh. Who negligently or designedly permits any violation of the law by any other person; or

Eighth. Who makes or signs any false entry in any book, or makes or signs any false certificate or return, in any case where he is by law or regulation required to make any entry, certificate or return; or

Ninth. Who, having knowledge or information of the violation of any revenue law by any person, or of fraud committed by any person against the United States under any revenue law, fails to report, in writing, such knowledge or information to his next superior officer and to the Commissioner of Internal Revenue; or

Tenth. Who demands, or accepts, or attempts to collect, directly or indirectly, as payment or gift, or otherwise, any sum of money or other thing of value for the compromise, adjustment or settlement of any charge or complaint for any violation or alleged violation of law, except as expressly authorized by law so to do, shall be dismissed from office, and shall be held to be guilty of a misdemeanor, and shall be fined not less than one thousand dollars nor more than five thousand dollars, and be imprisoned not less than six months nor more than three years. The court shall also render judgment against the said officer or agent for the amount of damages sustained in favor of the party injured, to be collected by execution. One half of the fine so imposed shall be for the use of the United States, and the other half for the use of the informer, who shall be ascertained by the judgment of the court.

or agent appointed and acting under the authority of any revenue law of the United States, first, who is guilty of any extortion or wilful oppression under color of law, or, second, who knowingly demands other or greater sums than are authorized by law, or receives any fee, compensation or reward, except as by law prescribed, for the performance of any duty, . . . shall be fined not less than one thousand dollars nor more than five thousand dollars, and be imprisoned not less than six months nor more than three years. The court shall also render judgment against said officer or agent for the amount of damages sustained in favor of the party injured, to be collected by execution. One half of the fine so imposed shall be for the use of the United States, and the other half for the use of the informer, who shall be ascertained by the judgment of the court."

Section 23 of the above act of February 8, 1875, provides: " All acts and parts of acts imposing fines, penalties or other punishment for offences committed by an internal revenue officer or other officer of the Department of the Treasury of the United States, or under any bureau thereof, shall be, and are hereby, applied to all persons whomsoever, employed, appointed or acting under the authority of any internal revenue or customs law, or any revenue provision of any law of the United States, when such persons are designated or acting as officers or deputies, or persons having the custody or disposition of any public money."

We are of opinion that these prosecutions cannot be sustained under the above statutes. The words " extortion or wilful oppression under color of law," and the knowingly demanding " other or greater sums than are authorized by law," or the receiving " any fee, compensation or reward, except as by law prescribed, for the performance of any duty " — illegal acts described in subdivisions one and two of section 3169 of the Revised Statutes — refer to offences committed by officers or agents " appointed and acting under the authority of any *revenue* law of the United States." The accused, in his capacity of Chinese inspector, did not act under any law that could properly be regarded as a revenue law. He was ap-

pointed pursuant to acts of Congress appropriating money to be used by the Treasury Department "to prevent unlawful entry of Chinese into the United States, by the appointment of suitable officers to enforce the laws in relation thereto, and for expenses of returning to China all Chinese persons found to be unlawfully within the United States." 26 Stat.: August 30, 1890, c. 837, pp. 371, 387; March 3, 1891, c. 542, pp. 948, 968; 27 Stat.: March 3, 1893, c. 208, pp. 572, 589; 28 Stat.: March 12, 1894, c. 37, p. 41; August 18, 1894, c. 301, pp. 372, 390; January 25, 1895, c. 43, pp. 636, 637; March 2, 1895, c. 187, pp. 843, 846; March 2, 1895, c. 189, pp. 910, 932; 29 Stat.: June 11, 1896, c. 420, pp. 413, 431. The Chinese Exclusion Acts have no reference to the subject of revenue, but are designed to exclude persons of a particular race from the territory of the United States. Clearly, Chinese inspectors, proceeding under the acts providing for their appointment, have no connection with the revenue system of the Government, although the execution of the acts referred to is committed to the Treasury Department.

Nor can the prosecutions be sustained under the twenty-third section of the act of February 8, 1875. That section does nothing more than subject persons employed, appointed or acting under the authority "of any internal revenue or customs law, or any revenue provision of any law of the United States," to the same fines, penalties or other punishment for offences committed by an internal revenue officer or other officer of the Treasury, or under any bureau thereof. The words, "internal revenue or customs law," do not include the statutes providing for the exclusion of Chinese persons from this country.

But there is a statute under which, in our judgment, a Chinese inspector, guilty of extortion under color of his office, can be prosecuted and subjected to fine and imprisonment. It is section 5481 of the Revised Statutes, providing that, "Every officer of the United States who is guilty of extortion under color of his office shall be punished by a fine of not more than five hundred dollars, or by imprisonment not more than one year, except those officers or agents of the United States other-

wise differently and specially provided for in subsequent sections of this chapter."

It is said that these indictments were not returned under that statute, and that the above indorsement on the margin of each indictment shows that the District Attorney of the United States proceeded under other statutes that did not cover the case of extortion committed by a Chinese inspector under color of his office. It is wholly immaterial what statute was in the mind of the District Attorney when he drew the indictment, if the charges made are embraced by some statute in force. The indorsement on the margin of the indictment constitutes no part of the indictment and does not add to or weaken the legal force of its averments. We must look to the indictment itself, and if it properly charges an offence under the laws of the United States, that is sufficient to sustain it, although the representative of the United States may have supposed that the offence charged was covered by a different statute.

That the first count of each indictment makes a case of extortion under color of office, within the meaning of section 5481, is too clear to admit of dispute. The court below, therefore, while erroneously adjudging that the prosecutions were embraced by section 3169 of the Revised Statutes and the above act of February 8th, 1875, did not err in overruling the demurrer to the first count of the respective indictments. We say nothing as to the second count in either indictment, because judgment on that count was arrested, and that action of the court is not subject to review on this writ of error. *United States* v. *Sanges*, 144 U. S. 310.

It is proper also to observe that there was error in the judgment as to the fine and imprisonment imposed upon the accused. Section 5481 of the Revised Statutes provides that the fine should not exceed $500, nor the imprisonment more than one year. If this were the only error complained of, the result would not be an entire failure of the prosecutions, for it would only be necessary for the court below to enter a new judgment, imposing such fine or imprisonment, or both, as the statute permitted.

But other errors are assigned relating to the conduct of the trial. They must be examined, because if any of them affect the substantial rights of the accused, a new trial must be the result in each case.

It is assigned for error that the District Court consolidated the two cases, and tried them at the same time and by the same jury. This objection is without merit. By section 1024 of the Revised Statutes it is provided: "When there are several charges against any person for the same act or transaction, or for two or more acts or transactions connected together, or for two or more acts or transactions of the same class of crimes or offences, which may be properly joined, instead of having several indictments the whole may be joined in one indictment in separate counts; and if two or more indictments are found in such cases, the court may order them to be consolidated." The accused having been charged with different acts or transactions "of the same class of crimes or offences," it is scarcely necessary to say that the transactions referred to in the indictments, being of the same class of crimes, could properly, that is, consistently with the essential principles of criminal law, be joined in one indictment against a single defendant without embarrassing him or confounding him in his defence. *Pointer* v. *United States*, 151 U. S. 396, 400. The plaintiff in error cites *McElroy* v. *United States*, 164 U. S. 76, as sustaining his objection to the consolidation. This is a misapprehension. The inquiry in that case was "whether counts against five defendants can be coupled with a count against part of them, or offences charged to have been committed by all at one time can be joined with another and distinct offence committed by part of them at a different time." It was held that the statute did not authorize that to be done. The Chief Justice, speaking for the court, said: "It is clear that the statute does not authorize the consolidation of indictments in such a way that some of the defendants may be tried at the same time with other defendants charged with a crime different from that for which all are tried." Here, the indictments were against the same person, the offences charged were of the same kind, were

provable by the same kind of evidence, and could be tried together without embarrassing the accused in making his defence.

If the offences could be joined in one indictment, it would follow, under the statute, that separate indictments could, in the discretion of the court, be consolidated and tried at the same time and before the same jury. Nothing in the record shows that the consolidation of these cases worked or could have worked any prejudice to the defendant.

At the trial below the Government read in evidence, over the objections of the accused, his affidavit filed in a divorce suit brought against him by Isabella M. Williams in the Supreme Court of San Francisco. That affidavit, made June 1, 1896, was as follows: " I have read the affidavit of plaintiff in reply on her motion for alimony, etc., and in reply thereto I desire to say it is untrue that prior to the time I entered the employment of the United States Government I was without means and had had no money for quite a time before, or that I had to borrow money to pay my living expenses. On the contrary, when I entered the employment of the United States Government, on or about the 28th day of September, 1893, I was worth more money then than I am at the present time, being worth about $5000, and since then having inherited some property; that the $3000 referred to in said affidavit was not acquired by me during the time I was in the employment of the United States Government, as set forth in said affidavit, but is a portion of the $5000 heretofore referred to. The statement in said affidavit that I have in my possession or had in my possession, in addition to the said sum of $3000 aforesaid, the sum of $5000 instead of $4000, is false and untrue; that, to my knowledge, plaintiff was not in the habit of carrying said sum of $5000 in the bosom of her dress. On the contrary, there was on deposit in the Hibernia Savings and Loan Society in her name, belonging to me, the sum of about $4000, which was a part of the $5000 possessed by me at the time I entered the employment of the United States Government. The $3000 in bank referred to is a portion of said sum so deposited in the name of plaintiff in the Hibernia

Savings and Loan Society. In answer to the statement contained on page 2 of said affidavit, to the effect that plaintiff paid for the piano therein referred to and the bill therefor was made out in her name, I simply desire to annex the bill for said piano to this affidavit, showing the bill to be made out in the name of R. S. Williams. The property at Nos. 420 and 422 Scott street, mentioned on page 2 of said affidavit, was acquired by my stepfather, Henry Monsferran, now deceased. He was a foreigner, unaccustomed to speaking the English language, and the details of the purchase were made by me, but the money that paid for said property was solely and exclusively the money of the said Henry Monsferran. The deed to the property was taken in his name. It is untrue that at the time plaintiff left our residence on the 29th day of April, 1896, she left said sum of $5000 in greenbacks. On the contrary, as above stated, there was no such sum, and the money referred to by her as having been drawn from the Hibernia Savings and Loan Society is $3000, so deposited in the savings bank. It is untrue, as stated in said affidavit, that I avoided the service of the summons and complaint in this action, or that by reason thereof plaintiff incurred an expenditure of $11.25."

It is stated in the bill of exceptions that, independently of that affidavit, there was no evidence whatever before the court relative to the matters therein referred to except certain bank books offered and read in evidence over the objections of the accused.

The bill of exceptions states that at the trial the prosecution offered in evidence a book of the deposit of moneys in the San Francisco Savings Union, a banking corporation of the State of California, which book and deposits were in the name of the defendant; also a book of the deposit of moneys in the Hibernia Savings and Loan Society, a banking corporation of the State of California, which latter book and deposits were in the name of Isabella M. Williams. The deposits in the San Francisco Savings Union, as evidenced by the book first mentioned, were as follows: October 29, 1893, $350; November 18, 1895, $400; December 17, 1895, $550, making a total

of $1300. The deposits in the Hibernia Savings and Loan Society, as evidenced by the bank book in the name of Mrs. Williams, were as follows: September 10, 1895, $300; September 24, 1895, $150; October 8, 1895, $800; October 23, 1895, $700; December 2, 1895, $1000, making a total of $3450.

It is stated in the bill of exceptions that these bank books and affidavit were the only evidence before the court relative to such deposits, and that there was no evidence indicating the existence of any privity or relation between the defendant and Mrs. Williams at the time the above deposits were made by her or at any other time, except as indicated in the above affidavit.

It may be also observed that when the affidavit and bank accounts were offered in evidence, no suggestion was made that the prosecution would at some stage of the trial show that the sums alleged to have been received by the accused under color of his office were part of any sum referred to in the affidavit and bank books.

The defendant duly excepted to the action of the court in allowing the affidavit and bank books to be read in evidence.

The manner in which the trial court dealt with this evidence appears from the following extracts from its instructions to the jury:

"There has been some testimony in support of the allegations of these indictments respecting the pecuniary condition of the defendant, and also testimony as to the extent of his compensation by the Government for services. This evidence was admitted in compliance with a well-known rule which establishes the relevance of evidence of this character where the charge is such as that alleged in these indictments. If the salary of the defendant, during the time alleged in the indictments and before then, was four or five dollars per day, and if the testimony shows to your satisfaction that he has deposited in bank or there was deposited to his credit in bank in the neighborhood of $4750 from September 10 to December 17, 1895, alleged in the indictments, then such testimony may be considered by you with a view of ascertaining how or by what means the defendant obtained that amount of

money at a time when his compensation by the Government, as is claimed by the prosecution, was not to exceed about $150 per month. Where did he get such large sums of money? From what source other than the source named in the indictments did he acquire this money? Has he furnished evidence explaining to your satisfaction the possession of these sums of money? These are all questions which you will consider, and if any explanation made by the defendant as to how he came by this money seems incredible, irrational and unsatisfactory you are at liberty to reject it and to act upon the other testimony in the case. If, after doing all this, you feel to a moral certainty and beyond a reasonable doubt that he took the money, as alleged in the indictments, then your verdict should be guilty. In reference to the testimony which has been introduced in the case showing the pecuniary condition of the defendant, that if testimony explaining how, when and by what means the defendant acquired possession of the sums of money shown to have been deposited in the San Francisco Savings Union and Hibernia bank could have been offered by defendant, and he failed to produce such testimony, then such failure may very properly be taken into consideration by the jury in determining the defendant's guilt or innocence. Where probable proof is brought of a state of facts tending to criminate the accused, the absence of evidence tending to a contrary conclusion may be considered, although this attitude of the case alone would not be entitled to much weight, because the burden of proof lies on the prosecution to make out the whole case by sufficient evidence; but when proof of inculpating circumstances had been produced tending to support the charge, and it is apparent that the accused is so situated that he could offer evidence of all the facts and circumstances as they existed, and show, if such was the truth, that the suspicious circumstances can be accounted for consistently with his innocence, and he fails to offer such proof, the natural conclusion is that the proof, if produced, instead of rebutting, would tend to sustain the charges. Therefore, if in this case the defendant could have produced testimony explaining his several deposits in the San Francisco Savings Union and the

Hibernia bank during the months of September, October, November and December, 1895, and has failed to produce such testimony, then you are at liberty to infer that any explanation in his power to make would have been, if made, adverse and prejudicial to the defence."

After referring to some authorities announcing the general rule that a party in omitting to produce evidence in elucidation of the subject-matter in dispute which is within his power, and which rests peculiarly within his own knowledge, frequently affords occasion for the presumption that such evidence, if adduced, would operate to his prejudice, and after referring to the affidavit made by Williams in the divorce suit, the court proceeded in its instructions : " It is the duty of the jury to ascertain from said affidavit and from the other testimony in the case what portions of the same are true. The jury is then at liberty to believe one part of it and to disbelieve the other part. Such affidavit was introduced upon the theory that it constituted an admission on the part of the defendant as to his ownership of certain funds referred to therein. The defence then insisted, as they had a right to, that the entire affidavit should be read. The whole of it is now before you, and it is for you to determine, from all of the circumstances of this case, the situation of the defendant, and all of the evidence that has been introduced, as to what portion of said affidavit, if any, is true. You are at liberty to believe or reject such portions of it as you think may be worthy of belief or disbelief. In this respect I call your attention to the deposits as they were made. . . . These deposits were made, as you will observe, at different times. In September he appears to have deposited the sum of $450 ; in October he deposited $1650 ; in November he deposited $1100, and in December, up to the 17th, he deposited $1550, making a total, as I said, of $4750 ; nine deposits in three months and seventeen days. Does the defendant's affidavit satisfactorily explain or account for the receipt of these sums of money ? "

We are of opinion that the affidavit and the bank books were not admissible in evidence against the accused. There

was nothing before the jury in respect of the matters referred to in the affidavit except the affidavit itself, and nothing relating to the deposits except that disclosed by the affidavit and the bank books. Taking the case to be as presented by the bill of exceptions, the utmost the evidence tended to show was that the accused had in his possession at different times certain sums that were deposited by him in bank to his credit or to the credit of his wife. It is to be observed that no sum so deposited corresponded in amount with the sums which he was charged with having extorted under color of his office as Chinese inspector. Upon the face of the transactions referred to there was no necessary connection between the deposits and the specific charges against the defendant. And yet the jury were in effect told that the failure of the accused to explain how he came by those sums, aggregating nearly five thousand dollars, was a circumstance tending to show that if he had given that explanation it would have operated to his prejudice in meeting the particular charges against him, of extorting at one time $100, and at another $85, under color of his office. There was no such connection shown between the possession by the defendant of the sums specified in the affidavit and bank books, and the alleged extortion by him of two named sums from certain persons, under color of his office, as required him to explain how he acquired the moneys referred to in the affidavit and bank books. The manifest object and the necessary effect of this evidence was merely to give color to the present charges, and to cause the jury to believe that the accused had in his possession more money than a man in his condition could have obtained by honest methods, and, *therefore*, he must be guilty of extorting the two sums in question. The present case does not come within the rule of evidence referred to by the learned court. The jury may have been unable to say from the evidence where the defendant obtained the moneys deposited in bank and specified in the bank book, aggregating $4750 between certain dates. But that did not justify the conclusion that he had, under color of his office as Chinese inspector, extorted one hundred dollars upon one occasion and eighty-

five dollars upon another occasion. The accused was entitled to stand upon the presumption of his innocence, and it cannot be said from anything in the present record that he was under any obligation arising from the rules of evidence to explain that which did not appear to have any necessary or natural connection with the offence imputed to him. In our judgment the court, under the circumstances disclosed, erred in not excluding the affidavit and bank books as evidence, as well as in what it said to the jury on that subject.

Another assignment of error relates to the admission, against the objection of the defendant, of certain evidence as to character. A witness called by the prosecution was permitted to testify that the defendant's reputation "in the custom house" was bad, although he had distinctly stated, upon preliminary examination, that he did not know the general reputation of the accused "outside of the custom house." This was error. Assuming (although the record is silent on the subject) that the accused introduced evidence of his general reputation for integrity, it is clear that evidence, on behalf of the prosecution, that among the limited number of people employed in a particular public building his character was bad, was inadmissible. The prosecution should have been restricted to such proof touching the character of the accused as indicated his general reputation in the community in which he resided, as distinguished from his reputation among a few persons in a particular building. The estimate placed upon his character by the community generally could not be shown by proof only as to the estimate placed upon him by persons in the custom house.

Another assignment of error deserves to be noticed. One of the witnesses for the defence was the collector of customs for the port of San Francisco. He was asked to whom, upon his return from Washington, was assigned the investigation of female cases. The court having inquired as to the purpose of this testimony, the attorney for the accused said: "It has been sworn to by Mr. Tobin that Mr. Williams asked for certain cases to be assigned to him and show the result. We propose to show by Mr. Wise that on his return from Wash-

ington he assigned to Williams the investigation of Chinese female cases, and while Mr. Williams was acting in that behalf there were more females sent back to China than ever were sent back before or after." The representative of the Government objected to this evidence as irrelevant, saying, in open court, and presumably in the hearing of the jury, "no doubt, every Chinese woman who did not pay Williams was sent back." The attorney for the accused objected to the prosecutor making any such statement before the jury. The court overruled the objection, and the defendant excepted. The objection should have been sustained. The observation made by the prosecuting attorney was, under the circumstances, highly improper, and not having been withdrawn, and the objection to it being overruled by the court, it tended to prejudice the rights of the accused to a fair and impartial trial for the particular offences charged.

> *For the several errors committed at the trial, to which we have referred, the judgment is reversed in each case, with directions to grant a new trial.*

MR. JUSTICE BREWER did not hear the argument in this case and did not participate in the decision.

MR. JUSTICE BROWN concurred in the result.