**UNITED STATES of America,
Plaintiff,**

v.

**Daniel SMITH, Jr., Defendant.**

**Cr. No. 800–55.**

United States District Court
District of Columbia.

Dec. 21, 1959.

Oliver Gasch, U. S. Atty., and Thomas A. Flannery, Asst. U. S. Atty., Washington, D. C., for plaintiff.

Paul R. Connolly, Jr., Washington, D. C., for defendant.

HOLTZOFF, District Judge.

This is a motion for a new trial on the ground of newly discovered evidence. The questions raised by the motion are of such a nature as to require a review of the history of the case, of the issues involved and of the evidence, in order to make it possible to determine the relation of the alleged newly discovered evidence to the other aspects of the case.

The defendant was indicted on a charge of murder in the first degree. The specific charge was that he beat his wife to death by means of striking her about the head and body with a blunt instrument. The contention of the Government at the trial was that he beat her over the head with two flatirons and an iron pipe, causing a hemorrhage from which she died. At the trial the defendant was represented by an experienced trial lawyer who specialized in the trial of criminal cases. The defense was con-

ducted energetically, intelligently and with well directed zeal.

The trial consumed almost three days and resulted on January 18, 1956, in a verdict of guilty of murder in the second degree. On February 10, 1956, the defendant was sentenced to imprisonment for a term of not less than ten and not more than thirty years. Subsequently, the defendant, *in propria persona* in view of the fact that apparently trial counsel felt that he should not pursue the matter any further, applied for leave to appeal *in forma pauperis*. This Court denied the application. The Court of Appeals for the District of Columbia Circuit later denied a similar application. The matter, however, was taken to the Supreme Court and on January 12, 1959, 358 U.S. 281, 79 S.Ct. 322, 3 L.Ed.2d 299, the Supreme Court vacated the order of the Court of Appeals denying leave to appeal and directed that leave to appeal *in forma pauperis* be granted.

The defendant then applied to this Court for the appointment of counsel. In view of the importance of the matter, the Court appointed a well known, experienced trial lawyer, Mr. Paul R. Connolly, to act as counsel for defendant. The Court appreciates the public service that Mr. Connolly has rendered in this matter and wishes to express its gratitude to him. In connection with his activities in the appellate proceedings, Mr. Connolly determined that a motion for a new trial on the ground of newly discovered evidence should be made. This motion was recently filed and has now been argued before this Court.

At the outset the question arises whether this motion was filed in due time. Rule 33 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., prescribes a limitation of two years "after final judgment" for the filing of a motion for a new trial on the ground of newly discovered evidence. Final judgment of this Court was rendered, as stated above, on February 10, 1956. Consequently, a much longer period than two years has expired since the rendition of the final judgment of this Court. It is argued, however, by counsel for the defendant. that the words "final judgment" as used in the rule are not limited to the final judgment of the trial court but may also include the final judgment of an appellate court. In this case, of course, no final judgment has as yet been rendered by any appellate court. It is the understanding of this Court that proceedings on the appeal have been stayed by the Court of Appeals during the pendency of this motion. It is, therefore, contended by counsel that actually the two-year period has not begun to run. Some support is found for the contention of defense counsel in a dictum contained in Harrison v. United States, 191 F.2d 874, 876, a case decided by the Court of Appeals for the Fifth Circuit. Assuming, without deciding, that this motion was timely filed, the Court will determine it on its merits. In view of the importance of the issues involved the Court is of the opinion that it would not be in the interest of substantial justice to dispose of such a motion as this on what, after all, would be a technical ground.

The newly discovered evidence consists of affidavits made by five eminent neurosurgeons in this city, which contradict the medical opinion expressed by the deputy coroner at the trial, the deputy coroner, himself, being a physician of long experience and many years' standing. At this point the Court wishes to observe that the affidavits of these neurosurgeons were not made on any partisan basis. They were not prepared for compensation but were made as a matter of public service at the request of defense counsel, who, himself, is rendering a public service. For this reason the Court feels indebted to these neurosurgeons for their public spirited contribution to the administration of justice.

At the outset we must determine whether, however, the evidence submitted is strictly speaking newly discovered. It is evidence that was available and could have been obtained for use at the trial. If the deputy coroner's testimony surprised defense counsel and he needed a short continuance in order to

consult other physicians, I think it is reasonable to assume that such a continuance would have been granted in the interest of justice. It is natural for different counsel to use different strategy in the trial of a case. Counsel who now appears is using a strategy of a different nature than that employed by trial counsel. The rule has always been that newly discovered evidence must be evidence that could not have been discovered by the exercise of due diligence for use at the trial. Otherwise a motion for a new trial on the ground of newly discovered evidence is ordinarily denied. So, too, such evidence must not be cumulative. While, therefore, the Court has grave doubt as to whether the evidence here presented in support of the motion is strictly speaking newly discovered evidence in the sense in which the term is used in the doctrines governing such motions, nevertheless, the Court is going to determine the matter on its merits because it is of the opinion that substantial justice requires disposition of that kind.

If there has been a miscarriage of justice, it should be rectified irrespective of any technical obstacles, and that is the usual view of this Court where substantial rights are involved. At the same time it must be borne in mind that the granting of a new trial is a very serious matter. The longer the time that has elapsed since the trial has taken place, the more serious the matter becomes. Granting a new trial does not merely mean recalling the witnesses and having them give the same testimony all over again, plus the addition of new evidence. It is not as simple as that. Here more than three years have expired since the trial. During the intervening period, witnesses may have disappeared or some of them may have died, while the memory of others may have faded to a considerable extent so that they can not recall certain details, and their testimony would be very much weakened. Consequently, it may be difficult to secure a conviction at a second trial if a long interval of time elapses between the first and second trial.

The public interest must always be borne in mind. The best guide that this Court finds in this respect is an expression of Mr. Justice Cardozo in Snyder v. Commonwealth of Massachusetts, 291 U. S. 97, at page 122, 54 S.Ct. 330, at page 338, 78 L.Ed. 674, where that great jurist stated:

" * * * justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true."

Another great jurist, Judge Learned Hand, in the case of United States v. Garsson, D.C., 291 F. 646, 649, stated:

"Under our criminal procedure the accused has every advantage. While the prosecution is held rigidly to the charge, he need not disclose the barest outline of his defense. He is immune from question or comment on his silence; he cannot be convicted when there is the least * * * doubt in the minds of any one of the twelve."

And again he resumes, in the same opinion:

"Our dangers do not lie in too little tenderness to the accused. Our procedure has been always haunted by the ghost of the innocent man convicted. It is an unreal dream. What we need to fear is the archaic formalism and the watery sentiment that obstructs, delays, and defeats the prosecution of crime."

Within the past year or two an eminent English judge, Mr. Justice Devlin, in a book recently published and entitled "The Criminal Prosecution in England", made the following remark at page 135:

"When a criminal goes free, it is as much a failure of abstract justice as when an innocent man is convicted."

Consequently the public interest must always be considered on a motion such as is presented here. It does not mean, of course, if the Court finds that there is a reasonable probability

that there has been a miscarriage of justice that such a motion should not be granted. This Court would not hesitate to order a new trial if it were convinced of such a probability, but the matter must be approached with caution and circumspection.[1]

This brings me to a consideration of the evidence introduced at the trial. As had been stated, it was the contention and the theory of the Government that the defendant beat his wife to death by hitting her with two electric irons and an iron pipe. To be sure, all of the evidence introduced at the trial bearing on the crucial issue was circumstantial. There were no eye witnesses to the alleged murder.

There is a popular notion that circumstantial evidence is an inferior kind of evidence. This idea is erroneous and fallacious. Frequently circumstantial evidence is much more convincing and much more reliable than direct evidence of eye witnesses. An eye witness may easily make a mistake in his observation, his memory may be uncertain by the time the date of the trial arrives, and occasionally an eye witness may even fabricate his testimony. On the other hand, circumstantial evidence all pointing in one direction is not subject to these infirmities. Necessarily, circumstantial evidence must be strong. It must be strong enough to convince the jury beyond a reasonable doubt, and it did so in this case.

The evidence in this case may be summarized very briefly so far as the crucial issue is concerned. The defendant came home one night and found his wife out. He missed a large sum of money and he immediately assumed his wife had stolen it. He went to a neighbor's house, where he suspected his wife had gone, and found her there under the influence of liquor. He roughly insisted on her going back home and threatened to kill her. He led her back home and pushed her into the house. A short time later screams were heard from inside the house and then the voices were stilled.

The body of the wife was found with wounds in her head and blood oozing from it. She never regained consciousness. The evidence showed that there was no one in the room at the time beside the deceased and the defendant. The police found two electric flatirons underneath the bed in that room. The tip of one of the flatirons had blood on it. The other had blood splattered on it. An iron pipe lay alongside, which was likewise splattered with blood. There was blood all over the floor and blood splashed on the walls at a fairly high level.

When questioned by the police the defendant claimed that his wife fell on the floor because she was under the influence of liquor and that her death was probably caused by the fall. When asked to explain the blood on the flatiron, on the iron pipe and on the walls, he had no explanation to advance. At the trial he did not testify.

The Court is of the opinion that this evidence clearly led to the conclusion that the death was caused by the fact that the deceased was struck by the electric irons and the iron pipe because, as stated, blood was found on those articles. This evidence was coupled with the testimony of the deputy coroner, who is a physician of many years' standing and long experience in performing autopsies, that the cause of death was a hemorrhage of the brain. He also expressed the opinion that the wounds in the head and the consequent hemorrhage were caused by a blow from a moving force.

The five neurosurgeons, whose affidavits are adduced on this motion, expressed the medical opinion that such a hemorrhage could have been caused not only by a blow from a moving force but also by falling down on a stone or a wooden floor. In reply the deputy coroner submitted an affidavit in which he makes the following comments:

"It must be borne in mind that these affidavits are submitted on a hypothetical question since the other doctors never saw the body of the decedent."

1. See Connelly v. United States, 8 Cir., 271 F.2d 333.

And again he states:

"I must emphasize that I actually saw the injuries on the head and they were all on the right side, and I stated in my opinion they were not caused by the decedent falling down. The other doctors, of course, never saw those wounds and therefore their opinions are entitled to little weight. In medicine opinions frequently vary but any competent medical practitioner, irrespective of his specialty, will agree that a doctor who actually sees a patient or performs an autopsy on a body is in a much better position to give a valid opinion than one who merely answers a hypothetical question.

"I still feel that the opinion which I gave at the trial of this matter was a valid opinion based on sound reason and I see no reason to change at this time."

The deputy coroner also refers to the fact in his affidavit that during the time he has been connected with the Coroner's Office he has performed at least 2,000 autopsies and that he has performed many autopsies where what is technically known as subdural hematoma was the cause of death. The type of hemorrhage here involved is medically known as subdural hematoma.

The Court is of the opinion that medical testimony cannot be weighed alone, but must be taken together with the circumstantial evidence in this case which all points inexorably in the direction of the defendant's guilt. How did the blood get on the flatirons? How did it get on the iron pipe? How was it splattered all over the room, especially on the walls? I might say it was stipulated that this blood was the blood of the deceased. The blood obviously came from the deceased's head because that is where the hemorrhage was. If she had fallen and struck her head and fractured it, there would not have been blood on all these articles, nor would it have been splattered high up on the walls.

The Court is of the opinion that no miscarriage of justice has resulted in this case. It is further the opinion of this Court that a new trial, even if this additional medical testimony were adduced, is not likely to change the result. The Court is further of the opinion that the ends of justice not only fail to require the granting of the motion but that on the other hand the ends of justice might be defeated if the motion were granted. The motion for a new trial on the ground of newly discovered evidence is denied.

In conclusion the Court wants to repeat its expression of gratitude to Mr. Connolly and to the five neurosurgeons who have rendered a public service and have thereby aided in the administration of justice.